USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  7/27/2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

STANLEY JONAS and DUTCH BOOK
PARTNERS,

                          Plaintiffs,

        -against-

THE ESTATE OF GUSTAVE LEVEN;
JACQUES CUGNY; CHARLES BROLL;
TANYA TAMONE; JEAN-PAUL
CROISIER; GESTRUST SA; BARNELI &
CIE SA; FRANCE VENDOME; THE REDID
TRUST; and THE RASHI FOUNDATION,

                          Defendants.

---

14-Cv-3369 (SHS)

OPINION & ORDER

SIDNEY H. STEIN, U.S. District Judge.

This is the story of an international business deal gone wrong.  In 2006, Gustave Leven, the founder of the Perrier mineral water empire, and plaintiffs Stanley Jonas and his investment advisory firm Dutch Book Partners, LLC purportedly entered into an oral agreement by which Leven agreed to invest $500 million in a new Cayman Islands based investment portfolio to be managed by Jonas.  After Leven failed to pay the $500 million investment and withdrew an additional $50 million of funds that he had in fact provided, plaintiffs filed this litigation in New York state court to recover the fees and profits they claim they would have earned on the original investment.  This lawsuit is plaintiffs' desperate attempt to hold someone among eleven defendants accountable for the losses they allegedly sustained.

After removing this action to the Southern District of New York, various defendants filed motions to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(2) for want of personal jurisdiction and Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.  The

Court finds that it lacks personal jurisdiction over the moving defendants—all foreign nationals or corporations—on the grounds that they had essentially no connection with the state of New York.  The Court therefore grants their respective motions to dismiss the complaint.

## I.   BACKGROUND[1]

In early 2006, Jonas, a New York investment broker, traveled to Paris, France to market his new "principal protected investment strategy," which enabled investors to speculate on interest rate movements while avoiding the loss of their principal investment. (SAC ¶¶ 1, 43, 45-46.)  Leven attended Jonas's presentations in Paris to learn more about his investment strategy. (*Id*. ¶ 45.)  According to Jonas, Leven had a "substantial amount of assets maintained in United States Treasuries and was seeking a way to hedge their principal risk should U.S. interest rates move substantially higher." (*Id*.)

Leven, then the head of France Vendome, a large financial holding company in France, approached Jonas through a former colleague of Jonas's, Jon Manual Rozan, one of France's leading options experts. (*Id*. ¶¶ 43-44.)  Jonas was also introduced to Jacques Cugny, Leven's lawyer, and Claude Broll, who was Vice Chairman of France Vendome and a director of the Rashi Foundation, an Israeli charitable organization, and Gestrust SA, the Swiss trustee of a trust established by Leven. (*Id*. ¶¶ 21, 43.)

### A.   The Alleged $500 Million Oral Investment Agreement

During various meetings between Leven and Jonas in France, Jonas made oral and written presentations of his proposed "Dutchbook + Two

---

[1] The following background section includes the facts as alleged by plaintiffs in their second Amended Complaint (the "SAC" or "complaint"), as well as certain jurisdictional facts as set forth in the declarations of the parties.

Year Note Treasury Hedge Portfolio Strategy."[2] (SAC ¶ 47.)  Ultimately, Leven made the following investment proposal to Jonas:

a.  Leven would transfer a "seed investment" of $500,000,000 of United States Treasuries held at that time at Union Bank in Switzerland to a Cayman Islands based fund for a minimum of two years in order to create a track record of success for that portfolio, in which Leven would be the only investor;

b.  In return, Leven would obtain a 50% interest in Jonas's Dutch Book Partners, a Delaware limited liability company;

c.  Jonas would complete the formation and funding of Dutch Book Partners and the Cayman Islands based fund;

d.  Jonas through Dutch Book Partners would manage the "Dutch Book + Two Year Note Treasury Hedge Portfolio" and Dutch Book Partners would receive two percent of funds under management for its expenses and services;

e.  Dutch Book Partners would also retain 20% of the profits in the trading based on the increase in value of the assets under management;

f.  After a track record of success had been established, Leven—through Aurel Leven[3] and Gestrust—would help to market the fund; and

g.  Leven and Partners would split any profit, losses, and costs at the end of each year of the agreement.

(*See* SAC ¶¶ 3, 53.)

---

[2] A Dutch Book is "a set of positions 'betting' on a particular outcome that, in sum, earns a positive return for the owner of the 'Dutch Book' regardless of the outcome." (Information Memorandum at iii, Ex. C annexed to the Decl. of Kevin A. Burke, dated October 31, 2014 ("Burke Decl.").)

[3] Aurel-Leven was a French financial conglomerate and Leven's family brokerage and investment banking firm (*id.* ¶¶ 19, 52), which has already been dismissed from this litigation (*see* Dkt. No. 34).

In addition to the $500 million seed investment, which constituted the "Two Year Portfolio element," the alleged agreement also anticipated a $50 million investment by Leven, which was to function in some way as a hedge to the $500 million portfolio. (*Id.* ¶ 54.)  This "Hedge Portfolio" was central to Jonas's investment strategy.  (*Id.*)  Leven, Broll, and Cugny informed Jonas that the investment was "for and through the funding of Rashi." (*Id.* ¶ 52.)  Leven promised that Broll, through Aurel-Leven and Gestrust, would help market the fund "once a sufficient track record had been acquired," and that Cugny, "Leven's Swiss agent," would set up the investment vehicle through which Leven would form the joint venture with Jonas. (*Id.* ¶¶ 56-57.)  There is no writing that captures any part of this oral understanding.

In June 2006, Leven allegedly sought to modify the agreement. (*Id.* ¶ 59.)  Instead of depositing $500 million in Dutch Book Partners' Cayman Islands fund, Leven sought to maintain the money in a segregated account at Union Bank in Switzerland ("UBS").  Leven still agreed to deposit $50 million as the "initial margin" with the agreed-upon clearing broker and reaffirmed that he would pay the above-outlined fees to Jonas. (*Id.* ¶¶ 59-60, 87.)  However, the parties did not reduce this modification to writing.

**B.  The $50 Million Subscription Agreement between Barneli & Cie SA and Dutch Book Fund SPC, Ltd.**

Certain parties entered into a written investment agreement regarding the $50 million investment in the summer of 2006.

In late June of that year, Jonas flew to Paris to meet with Leven at the office of France Vendome and at Leven's residence to finalize and execute a Subscription Agreement and Private Placement Memorandum.[4]  The Subscription Agreement concerned the purchase of $50 million worth of

---

[4] The complaint contains a single reference to a Private Placement Memorandum and otherwise refers to, and relies upon, the Subscription Agreement and a July 1, 2006 "Information Memorandum." (*See id.* ¶¶ 61, 70-76; Ex. C to Burke Decl.)

shares in the Dutch Book Segregated Portfolio I, a segregated portfolio of Dutch Book Fund SPC, Ltd. (the "Fund"), a Cayman Islands exempted company. (Ex. C to Burke Decl.)  Before executing the agreement, Leven sought various changes concerning the lock-up period and the creation of a class of stock just for him. (SAC ¶ 61.)  At this meeting, Leven and Cugny informed Jonas that Leven would invest "as the beneficiary of a trust"—the Redid Trust—which was formed for the benefit of Rashi and would be administered by Gestrust as trustee. (*Id.*)

Ultimately, Barneli & Cie SA, a Panamanian corporation of which Leven was the disclosed principal (*id.* ¶¶ 4, 15, 72, 85), entered into the Subscription Agreement to purchase $50 million of Class C shares of the Dutch Book Segregated Portfolio I.  (Subscription Agreement at S-4, S-18, Ex. C to Burke Decl.)  The Subscription Agreement and Information Memorandum provided that the shares would be managed as part of an investment program established by the investment adviser, Dutch Book Partners, LLC. (Information Memorandum at ii, v, Ex. C to Burke Decl.; SAC ¶ 48.)

"[W]hile acting on behalf of Barneli," Cugny sent the Subscription Agreement to Fortis, a bank in Ireland,[5] which provided wire instructions regarding the investment. (SAC ¶¶ 63, 65, 75.)  Indeed, Cugny executed the Subscription Agreement, in a "representative capacity," as the general attorney for Barneli. (Subscription Agreement at S-18, Ex. C to Burke Decl.)  Cugny sent additional required documentation to Fortis using his personal email address, and Fortis sent wiring instructions to Cugny directly. (SAC ¶ 75.)  In addition, Cugny, Tanya Tamone, treasurer and director of Barneli (*id.* ¶ 11), and Herve Pollet, signed the Subscription Agreement as "authorized signatories," *i.e.*, persons authorized to give and receive

---

[5] Fortis Prime Fund Solutions Bank also has a Cayman Islands location, and the Subscription Agreement indicates that completed agreements were to be sent there. (*See* Subscription Agreement at S-1, Ex. C to Burke Decl.)

instructions between the Fund and the subscriber, Barneli. (Subscription Agreement at S-6, Ex. C to Burke Decl.)

The Subscription Agreement included an indemnification clause, as follows:

> The Subscriber hereby agrees to indemnify the Fund on behalf of the relevant Portfolio(s), its Directors and officers, the Administrator, the Investment Adviser and their respective directors, officers, employees, agents and representatives against any and all liability, costs, claims, and expenses (including, without limitation, reasonable attorneys['] fees for the investigation of and preparation of a defense to any such liability, claims, costs and expenses) resulting from a breach of any of the foregoing representations.

(Subscription Agreement at S-12, Ex. C to Burke Decl.)

The Subscription Agreement also provided that (1) "[n]either this Subscription Agreement nor any term hereof may be changed, waived, discharged, or terminated except with the written consent of the Subscriber and Fund's Board of Directors" and (2) Cayman Islands law shall govern the Subscription Agreement. (*Id.* at S-11.)

### C.  Subsequent Negotiations and Liquidation of Barneli's $50 Million Investment

Trading on the Fund began in August 2006. (SAC ¶ 79.)  One month later, Jonas met with Leven and Rozan at Leven's home in Cannes, France. (*Id.* ¶ 80.)  Leven allegedly reiterated his desire to invest more money with Jonas, but Leven was concerned about his other financial obligations and the tax implications of transferring $500 million from the UBS account in Switzerland to a French-controlled bank. (*Id.* ¶¶ 80-81, 92.)  Jonas left France with "assurances that as soon as the technical issues could be solved, the $500,000,000 plus substantially more would be transferred," and Jonas began looking for a non-French home for the Fund. (*Id.* ¶¶ 83, 92.)

In October of that year, the by-laws of the Fund were amended to allow for withdrawals from the $50 million investment "upon 7 days notice as a result of the specific request of Leven and in reliance on the continued promise of the minimum management fee of 2% of the $500 million position in U.S. Treasuries." (*Id.* ¶ 84.)  Leven also told Jonas that he intended to withdraw money from the Fund despite Jonas's warnings that a withdrawal would incur substantial losses. (*Id.* ¶¶ 85-89.)  In response to an inquiry from Dutch Book Partners, Cugny confirmed with Leven that Leven wanted to withdraw $30 million from the Fund. (*Id.* ¶¶ 85-86.)  Leven also insisted that Jonas and Dutch Book Partners continue to operate the Fund in the same manner as before. (*Id.* ¶¶ 90-91.)

Given the incongruity between the actual and expected amount of money invested—either $500 million or $550 million expected and only $50 million invested—it is not surprising that the parties' relationships soon began to unravel.  In May of 2007, Leven called Jonas, who indicated to Leven that "unless Leven was willing to follow through with the 'hedge fund program' entirely, not just one piece, it could not be marketed to others and . . . made no sense [to continue as] an outright investment." (*Id.* ¶ 93.)  Against Jonas's advice, Leven ordered Jonas, by telephone, to liquidate the hedge portion of the Fund immediately.  (*Id.* ¶ 94.)  Leven still agreed to "take care" of the fees plaintiffs had theretofore incurred. (*Id.* ¶ 95.)

One month later, Jonas met with Leven, Tamone, and Gestrust at Gestrust's offices in Geneva, Switzerland.  (*Id.* ¶ 98.)  In preparation for that meeting, Jonas prepared several summaries, which "demonstrat[ed] the folly of [Leven's] liquidation requests" and the "significant gains" that would have been realized had the money remained in the Fund. (*Id.* ¶¶ 96-97.)  Instead of discussing the continuation of the joint venture, the performance of the portfolio, or the payment of Jonas's outstanding fees, Leven blamed Jonas for allowing him to liquidate the assets in the Fund. (*Id.* ¶¶ 99-100.)

Nonetheless, Jonas thought their business relationship could be salvaged. Jonas relied on the representations of Tamone—on behalf of Gestrust—who sought "additional documentation from Jonas under the guise of considering further investment." (*Id.* ¶¶ 101-02.) But with no additional investments in sight, in late August 2007, Jonas compiled and transmitted a financial assessment reflecting the losses he had incurred as a result of the unreimbursed costs and management fees. (*Id.* ¶¶ 103-04.) As of September 2007, Jonas had not been paid any of the fees he believes were owed to him. (*Id.* ¶ 106.)

The investment strategy outlined in the complaint is, at the very least, complicated. Luckily for this Court and the reader, it is unnecessary for the purposes of deciding these motions to determine whether this scheme is a legitimate road to the riches of Croesus or a house of cards destined to collapse or something in between.

### D.   The 2008 Litigation

As the relationship soured, the parties began to dispute who was responsible for the loss of money in the Fund. In early 2008, "at the specific behest of Leven," Barneli commenced a lawsuit in New York state court, seeking to recover the losses sustained on the $50 million investment made pursuant to the Subscription Agreement. (*Id.* ¶¶ 15, 107.) Plaintiffs expended $500,000 in legal fees in their successful defense of that litigation (*id.* ¶ 134), which the New York State Supreme Court, Appellate Division dismissed in May 2012 (*id.* ¶ 109). During the course of that litigation, Leven died. (*Id.* ¶ 4 n.2.)

### E.   This Action

Plaintiffs brought this breach of contract action in New York Supreme Court in June 2013 against eleven defendants: The Estate of Leven, Cugny, Tamone, Broll, Jean-Paul Croisier, Gestrust, Barneli, France Vendome, Aurel-Leven, the Redid Trust, and Rashi. After plaintiffs filed an amended

complaint in February 2014, the action was removed to federal court in May of last year. (Notice of Removal, Dkt. No. 2.)

The state court gave plaintiffs nearly a year to serve defendants, all of whom are foreign nationals or corporations, and this Court extended the deadline to August 18, 2014, almost fourteen months after the original complaint had been filed. (Dkt. No. 25.)

At this Court's initial pretrial conference in August 2014, the Court granted plaintiffs a second opportunity to amend the complaint and emphasized that plaintiffs should focus on factual allegations supporting the Court's exercise of personal jurisdiction over defendants, since whether or not personal jurisdiction existed was manifestly a threshold issue. (Aug. 7, 2014 Tr. at 25:8-19.)   The Court underscored two other points: (1) any remaining service of process must occur on or before August 18, 2014; and (2) should any Rule 12(b) dismissal motions succeed following plaintiff's second amended complaint, the Court would dismiss the case with prejudice. (*Id.* at 24:2-25, 32:18-23.)

Plaintiffs have filed affidavits of service upon all defendants except Broll, France Vendome, and the Estate of Leven.[6]  Plaintiffs attempted to serve Barneli (Dkt. No. 24), but later acknowledged that that service was ineffective because Barneli had been dissolved (Aug. 7, 2014 Tr. at 7:2-7). Plaintiffs also admit that the Estate of Leven is closed (*id.* at 6:19-23). Accordingly, those entities have not been served with process.

The gravamen of the second amended complaint is that defendants breached the oral agreement with Jonas by (1) failing to provide the $500 million seed investment necessary to effectuate the Dutch Book investment strategy; and (2) failing to pay the fees plaintiffs incurred in setting up and trading the Fund.  Plaintiffs seek more than $74 million in unpaid fees and

---

[6] (*See* Dkt. Nos. 19-22, 24, 35-37; Decl. of Claude Broll in Supp. of Mot. to Dismiss, dated October 31, 2014 ("Broll Decl.") ¶ 21 ("I have never been served with a summons or complaint in this action.").)

expected lost profits.  In addition, plaintiffs allege that defendants breached the indemnification provision of the Subscription Agreement by failing to indemnify plaintiffs for the costs of the 2008 lawsuit brought by Barneli.  Plaintiffs seek to hold most of defendants—Croisier, Cugny, Tamone, Leven, and Gestrust—liable on an alter ego theory and hold others—Broll, France Vendome, Gestrust, Redid and Rashi—liable on a hidden principal theory, which they allege as a separate cause of action.[7] Plaintiffs voluntarily dismissed the litigation against Aurel-Leven without prejudice in October 2014. (Dkt. No. 34.)

Defendants Broll, Cugny, Tamone, Croisier, Gestrust, and Rashi have now moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(2) and 12(b)(6) on the grounds that the Court lacks personal jurisdiction over them and that plaintiffs have failed to state a claim upon which relief can be granted.  Broll independently moves to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(5) for insufficient service of process.  Because plaintiffs have failed to make a prima facie showing that this Court has personal jurisdiction over the moving defendants, their respective motions to dismiss the complaint are granted.

## II.  LEGAL STANDARD

"The lawful exercise of personal jurisdiction by a federal court requires satisfaction of three primary requirements."  *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012).  First, "the plaintiff's service of process upon the defendant must have been procedurally proper"; second, "there must be a statutory basis for personal

---

[7] At times, plaintiffs argue inconsistently which defendant is liable pursuant to what theory.  For instance, plaintiffs allege that Gestrust was an alter ego of Barneli (*see, e.g.*, SAC ¶ 138), but then chastise Gestrust for analyzing its liability under plaintiffs' own alter ego theory, admitting that Gestrust could not be an alter ego of Barneli (Pls.' Mem. of Law in Opp'n to Def. Gestrust SA's Mot. to Dismiss ("Pls.' Opp'n Gestrust") at 12-13, Dkt. No. 68).

jurisdiction that renders such service of process effective"; and third, "the exercise of personal jurisdiction must comport with constitutional due process principles." *Id.* at 59-60.

The plaintiff bears the burden of establishing jurisdiction and must make a prima facie showing that jurisdiction exists. *See Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34-35 (2d Cir. 2010). "Such a showing entails making legally sufficient allegations of jurisdiction, including an averment of facts that, if credited[,] would suffice to establish jurisdiction over the defendant." *Id.* at 35 (internal quotation marks omitted). The plaintiff must also "establish the court's jurisdiction with respect to *each* claim asserted." *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004).

In deciding a motion to dismiss a complaint for want of personal jurisdiction, the district court may consider materials outside the pleadings, including affidavits and other written materials. *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012); *Bensusan Rest. Corp. v. King*, 937 F. Supp. 295, 298 (S.D.N.Y. 1996), *aff'd*, 126 F.3d 25 (2d Cir. 1997). The court assumes the verity of the allegations "to the extent they are uncontroverted by the defendant's affidavits." *MacDermid, Inc.*, 702 F.3d at 727 (internal quotation marks omitted). Nonetheless, all factual doubts or disputes are to be resolved in the plaintiff's favor. *See, e.g., A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79–80 (2d Cir. 1993).

In diversity cases such as this, a district court looks to the law of the state in which it sits to determine whether it has personal jurisdiction over foreign defendants. *See Int'l Shoe Co. v. State of Wash., Office of Unemp't Comp. & Placement*, 326 U.S. 310 (1945); *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999). This Court will therefore look to New York law to determine whether it may exercise personal jurisdiction over defendants.

Pursuant to N.Y. C.P.L.R. § 301, a defendant is subject to personal jurisdiction if he is domiciled in New York, served with process in New

York, or continuously and systematically does business in New York.  *See Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.*, 77 N.Y.2d 28, 33 (1990); *Pichardo v. Zayas*, 122 A.D.3d 699, 702, 996 N.Y.S.2d 176, 180 (2d Dept. 2014); *see also Wells Fargo Bank Minnesota, N.A. v. ComputerTraining.Com, Inc.*, No. 04-Cv-0982, 2004 WL 1555110, at *2-3 (S.D.N.Y. July 9, 2004).  In addition, a defendant may be subject to New York's long-arm statute, N.Y. C.P.L.R. § 302, if he engages in the following acts either in person or through an agent *and* such acts relate to an asserted claim:  (1) transacts any business within the state or contracts anywhere to supply goods or services in the state; (2) commits a tortious act within the state; (3) commits a tortious act outside the state but injures a person or property in the state; or (4) owns, uses, or possesses any real property in the state.  N.Y. C.P.L.R. § 302(a).

### III. DISCUSSION

Defendants seek dismissal on several grounds pursuant to Rule 12(b).  The Court considers the jurisdictional questions first, *see Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999), finds that they dispose of each of the pending motions, and therefore does not reach the issue of whether the complaint sets forth valid claims for relief pursuant to Rule 12(b)(6) or whether service of process on Broll was sufficient.[8]

---

[8] Although plaintiffs and Broll agree that he has not been served with process, they disagree as to how the Court should dispose of his pending motion to dismiss the complaint.  Plaintiffs assert that there is "nothing to dismiss" because "there is no pending action against Mr. Broll." (Letter from Ethan Leonard to Judge Stein, dated Jan. 22, 2015, Dkt. No. 77.)  Broll counters that the action is pending even though he has not been served and asks the Court to rule on the substantive merit of his motion. (Letter from Xavier Bailliard to Judge Stein, dated Jan. 23, 2015, Dkt. No. 78.)  Broll is correct that the Court may dismiss an unserved defendant's motion to dismiss with prejudice where the claims are deficient and an extension of time to serve would be futile, *see, e.g., Cuello v. Lindsay*, No. 09-CV-4525, 2011 WL 1134711, at *1 n.2 (E.D.N.Y. Mar. 25, 2011); *Ford v. Dep't of Soc. Servs.*, No. 10 CIV. 3800, 2011 WL 1458138, at *7

### A. The Complaint Fails to Allege Facts Sufficient for this Court's Exercise of Personal Jurisdiction over Defendants

In moving to dismiss, defendants argue in various forms that (1) they are foreign individuals or corporations who have not conducted any business in New York, whether in person or through an agent, and (2) Barneli's commencement of a lawsuit in New York, effectively availing itself of the protections of New York state and its laws, does not confer personal jurisdiction because the complaint fails to allege that Barneli was the agent or alter ego of defendants.

In opposition, plaintiffs contend that personal jurisdiction exists pursuant to N.Y. C.P.L.R. §§ 302(a)(1) and 302(a)(3) because plaintiffs negotiated the contracts from New York and defendants caused economic injury to plaintiffs in New York. They further assert that personal jurisdiction is proper pursuant to N.Y. C.P.L.R. § 303, which provides for the designation of an agent of service in New York—in certain limited instances—where a defendant has previously commenced a separate lawsuit in New York.

#### 1. *N.Y. C.P.L.R. § 301*

Defendants are not subject to general personal jurisdiction pursuant to N.Y. C.P.L.R. § 301. They are all foreign individuals and corporations[9] that

---

(S.D.N.Y. Mar. 22, 2011), and the Court will do so here, having found that it lacks personal jurisdiction over Broll even assuming he had been served properly.

[9] (*See* SAC ¶¶ 5, 9, 11, 13, 16, 21; Decl. of Def. Tanya Tamone, dated Oct. 31, 2014 ("Tamone Decl.") ¶¶ 3-5 (Swiss residence); Decl. of Def. Jacques Cugny, dated October 29, 2014 ("Cugny Decl.") ¶¶ 4-6 (Swiss residence); Decl. of Def. Jean-Paul Croisier, dated Oct. 31, 2014 ("Croisier Decl.") ¶¶ 3-5 (Swiss residence); Broll Decl. ¶¶ 1-2 (Belgian residence and French citizenship); Decl. of Itzik Turgeman in Supp. of the Rashi Foundation's Mot. to Dismiss the Second Am. Compl., dated Oct. 23, 2014 ("Turgeman Decl.") ¶ 3 (Israel as the only place of business of Rashi, an Israeli nonprofit association); Decl. of Marc P. Angst in Supp. of Mot. of Gestrust SA to Dismiss Second Am. Compl., dated Oct. 29, 2014 ("Angst Decl.") ¶¶ 1-2 (Swiss location of Gestrust, a Swiss trust and fiduciary company).)

do not systematically and continuously do business in New York, and plaintiffs do not argue otherwise.

### 2. *N.Y. C.P.L.R. § 302(a)(1)—transaction of business within the state*

Turning to specific personal jurisdiction pursuant to N.Y. C.P.L.R. § 302(a)(1), plaintiffs' allegations fail to establish that any defendant transacted business in New York within the meaning of the statute.

#### a. *Count One—Breach of the Oral Agreement Between Leven and Jonas*

The Court first analyzes whether defendants transacted business in New York—and are thereby subject to personal jurisdiction under N.Y. C.P.L.R. § 302(a)(1)—in relation to Count One of the SAC.[10]

"Whether a non-domiciliary is transacting business within the meaning of CPLR 302(a)(1) is a fact based determination, and requires a finding that the non-domiciliary's activities were purposeful and established 'a substantial relationship between the transaction and the claim asserted.'" *Paterno v. Laser Spine Inst.*, 24 N.Y.3d 370, 376 (2014). "Purposeful activities are volitional acts by which the non-domiciliary 'avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Id.* (quoting *Fischbarg v. Doucet*, 9 N.Y.3d 375, 380 (2007)). "More than limited contacts are required for purposeful activities sufficient to establish that the non-domiciliary transacted business in New York." *Paterno*, 24 N.Y.3d at 376. New York case law makes pellucid that "it is the quality of the defendants'

---

[10] Count Three of the SAC—alleging alter ego/hidden principal liability—is not a cognizable cause of action, but a means to impose liability on the moving defendants under the substantive counts, *see, e.g., Morris v. New York State Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 141 (1993); *Taberna Capital Mgmt., LLC v. Dunmore*, No. 08 Civ. 1817, 2009 WL 2850685, at *4 (S.D.N.Y. Sept. 2, 2009), and therefore the Court analyzes the agency/alter ego issues, as they arise, in relation to Counts One and Two.

New York contacts that is the primary consideration" in a 302(a)(1) analysis. *Fischbarg*, 9 N.Y.3d at 380; *see also Royalty Network Inc. v. Dishant.com, LLC*, 638 F. Supp. 2d 410, 417-18 (S.D.N.Y. 2009).

The U.S. Court of Appeals for the Second Circuit has also delineated four factors that guide the section 302(a)(1) inquiry:

> (i) whether the defendant has an on-going contractual relationship with a New York corporation; (ii) whether the contract was negotiated or executed in New York and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship; (iii) what the choice-of-law clause is in any such contract; and (iv) whether the contract requires . . . payments into the forum state or subjects [defendants] to supervision . . . in the forum state.

*Sunward Elecs., Inc.*, 362 F.3d at 22. The "pivotal inquiry" is whether the defendant has "performed purposeful acts in New York in relation to the contract." *Bonsey v. Kates*, 13 Civ. 2708, 2013 WL 4494678, at *4 (S.D.N.Y. Aug. 21, 2013) (internal quotation marks omitted).

As a starting place, it is helpful to review some of the key facts alleged in support of plaintiffs' first breach of contract claim. In 2006, Jonas and Leven allegedly entered into an oral agreement by which Leven agreed to provide a $500 million seed investment and Jonas agreed to create and manage the Dutch Book plus a hedge portfolio for a minimum of two years. (SAC ¶ 53.) All in-person meetings, both before and after this agreement was entered into, took place in France or Switzerland. (SAC ¶¶ 45, 61, 80, 98.) Leven first approached Jonas in Paris where Jonas was making a presentation about his low-risk investment strategy. (*Id.* ¶¶ 44-45.) The only individual defendants remotely involved in the early stages of Leven and Jonas's relationship are Cugny, Leven's lawyer and a Swiss citizen and resident who attended two meetings in France (*id.* ¶¶ 5, 43, 57, 61), and Broll, a French citizen and resident (at that time) who attended the initial meeting in France (*id.* ¶¶ 9, 43).

The money for the $500 million seed investment—which Leven never provided to Jonas—was located at Union Bank in Switzerland. (*Id.* ¶¶ 53(b), 81, 114(b).)  There are no allegations that this money ever flowed to New York.

The only money that Leven in fact provided—$50 million through Barneli, a Panamanian corporation—went from UBS in Switzerland to FIMAT, the clearing broker—which is part of Societe Generale, a French bank—where it was to be invested in shares of a Cayman Islands fund. (Subscription Agreement at S-5, Ex. C to Burke Decl.; SAC ¶¶ 81, 87.)  The parties to the Subscription Agreement were Barneli, as subscriber, and Dutch Book Fund SPC, Ltd., a Cayman Islands entity. (Subscription Agreement at S-18, Ex. C to Burke Decl.)  Cugny executed the agreement as a representative of Barneli, and he and Tamone, a British citizen and Swiss resident, signed the agreement as authorized signatories of Barneli. (Subscription Agreement at S-6, S-18, Ex. C to Burke Decl.; SAC ¶ 11.) Gestrust, a Swiss trust company, served as a trustee of the Bahamian entity that owned shares of Barneli, and signed an exhibit to the Subscription Agreement denoting its role as trustee. (SAC ¶ 20; Ex. C to Angst Decl.)

The Subscription Agreement is governed by Cayman Islands law. (Subscription Agreement at S-11, Ex. C to Burke Decl.)  Jonas sent the related Information Memorandum—which appointed Dutch Book Partners, LLC, a Delaware limited liability company, as investment adviser—to defendants in Switzerland and France. (SAC ¶ 74; Information Memorandum at v, Ex. C to Burke Decl.)

The individual defendants also engaged in several international communications related to the Subscription Agreement.  Cugny asked that the documentation related to the Subscription Agreement be sent to Switzerland (*id.* ¶¶ 64, 75), and he sent the executed agreement to Fortis in Ireland or the Cayman Islands (*id.* ¶¶ 65, 75; *see* n.5, *supra*).  Cugny also responded to someone from Dutch Book Partners regarding the partial withdrawal of the $50 million hedge, but plaintiffs do not allege that the

Dutch Book Partners representative was located in New York. (SAC ¶¶ 85-86.)  After the full liquidation of the $50 million investment—by Leven, over the telephone—Tamone met with Jonas in Switzerland in June 2007. (SAC ¶ 98; Tamone Decl. ¶ 9.)  During that summer, Tamone also sought documentation from Jonas under the alleged guise of considering further investment. (*Id.* ¶ 101; Tamone Decl. ¶ 10.)

This factual recitation reveals the astonishing lack of allegations linking plaintiffs' first cause of action to New York.  There are no allegations in the complaint that the oral agreement or the Subscription Agreement was negotiated in New York; or that the foreign defendants traveled to New York at any time whatsoever for purposes of engaging in any business transaction connected to these agreements.  Similarly, there are no allegations to substantiate plaintiffs' contention that the investments were to be effectuated in New York nor are there allegations to satisfy any of the *Sunward* factors.  As for defendant Croisier, plaintiffs fail to allege even a single fact in support of his involvement in the transaction, save for a bare allegation that he was president and director of Barneli. (SAC ¶ 13.)

The only allegation tying the first cause of action to New York is that Jonas's principal place of business is located in New York County.  (*Id.* ¶ 1.)  Even if the Court were to assume—without any allegation to support it—that Jonas was working in New York when Tamone reached out to him from Switzerland in the summer of 2007 (*id.* ¶ 101), or that the Dutch Book Partners representative was in New York when Cugny responded to him (*id.* ¶ 86), those allegations are simply insufficient to confer personal jurisdiction here.  *See Int'l Customs Assocs., Inc. v. Ford Motor Co.*, 893 F. Supp. 1251, 1261-62 (S.D.N.Y. 1995) ("Telephone calls and correspondence sent into New York, by a non-domiciliary defendant who is outside New York, generally are insufficient to establish personal jurisdiction." (collecting cases)), *aff'd*, 201 F.3d 431 (2d Cir. 1999); *Metals Alliance Corp. v. Beshay*, No. 97-CV-3401, 1998 WL 811788, at *2 (S.D.N.Y. Nov. 19, 1998) ("[O]nly in cases where the telephone call or communication clearly shows

that the defendant intends to project itself into ongoing New York commerce, such as where a defendant directly conducts market activity or securities transactions in New York over the telephone, do New York courts sustain jurisdiction based on telephone calls or facsimile transmissions alone." (internal quotation marks omitted)); *see also Kimco Exch. Place Corp. v. Thomas Benz, Inc.*, 34 A.D.3d 433, 434, 824 N.Y.S.2d 353, 354 (2d Dept. 2006) ("The defendants' acts of faxing the executed contracts to New York and of making a few telephone calls do not qualify as purposeful acts constituting the transacting of business.").

Plaintiffs' contention that the Court has personal jurisdiction because Jonas built out an office in New York, hired personnel, and performed trades and analyses here is also unavailing. Notwithstanding the fact that there are no specific allegations about Jonas's work in New York in the complaint, his unilateral activity in the forum state would be insufficient to establish jurisdiction. *See Int'l Customs*, 893 F. Supp. at 1262 ("The appropriate focus of an inquiry under C.P.L.R. § 302(a)(1) is on what the non-domiciliary defendant did in New York and not on what the plaintiffs did.") New York courts have consistently held that the unilateral acts of plaintiffs in the forum state do not support jurisdiction over a non-domiciliary defendant. *See, e.g.*, *Ferrante Equip. Co. v. Lasker-Goldman Corp.*, 26 N.Y.2d 280, 285 (1970); *SunLight Gen. Capital LLC v. CJS Invs. Inc.*, 114 A.D.3d 521, 522, 981 N.Y.S.2d 390, 391 (1st Dept. 2014); *Mortg. Funding Corp. v. Boyer Lake Pointe, LC*, 379 F. Supp. 2d 282, 287-88 (E.D.N.Y. 2005) ("Even though the Plaintiff may have expended time, energy and resources in New York . . . carrying out [its] obligations under the alleged contract, the Plaintiff's business interactions with New York are not at issue when assessing personal jurisdiction. Rather, the Court must evaluate the Defendants' activities and conduct" in New York.).

Moreover, Leven learned about Jonas's investment strategy when he attended Jonas's presentation in Paris. (SAC ¶ 45.) Since plaintiffs marketed their services internationally, "not just within the State of New

York . . . [Leven], in contracting with [] plaintiff[s], w[as] not seeking to take advantage of a field particular to New York." *Kimco*, 34 A.D.3d at 434.

In sum, no defendant transacted business in New York in relation to plaintiffs' first breach of contract claim, and therefore personal jurisdiction does not exist over defendants pursuant to N.Y. C.P.L.R. § 302(a)(1).

> b. *Count Two—Breach of the Indemnification Clause of the Subscription Agreement*

For this second cause of action, plaintiffs allege that defendants are subject to personal jurisdiction because Barneli filed a lawsuit in the state of New York in 2008, effectively availing itself of "the privilege of conducting activities within the forum State" and invoking the "protections of its laws." *Paterno*, 24 N.Y.3d at 376 (internal quotation marks omitted); (*see, e.g.*, SAC ¶ 8.)  Plaintiffs' second cause of action arises from this activity insofar as plaintiffs seek the recovery of legal fees incurred in defending the Barneli lawsuit.  Nonetheless, the Barneli litigation cannot provide a basis for jurisdiction over the moving defendants unless the acts of Barneli are attributable to them under an agency or alter ego theory.  The Court will analyze each in turn.

> i.  Agency Theory

For purposes of section 302(a)(1), the Court may attribute the acts of a corporation to individual defendants under an agency theory where (1) the corporation engages in purposeful activity in the forum state that relates to the transaction underlying the lawsuit, (2) the corporation's activity was taken for the benefit of and with the knowledge and consent of the defendant, and (3) the defendant exercised some control over the purposeful activity. *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988); *see also H.S.W. Enters., Inc. v. Woo Lae Oak, Inc.*, 171 F. Supp. 2d 135, 145 (S.D.N.Y. 2001).  "To make a *prima facie* showing of control, a plaintiff's allegations must sufficiently detail the defendant's conduct so as to

persuade a court that the defendant was a primary actor in the specific matter in question; control cannot be shown based merely upon a defendant's title or position within the corporation, or upon conclusory allegations that the defendant controls the corporation." *ADP Inv'r Commc'n Servs., Inc. v. In House Attorney Servs., Inc.*, 390 F. Supp. 2d 212, 219 (E.D.N.Y. 2005) (internal quotation marks omitted).  The moving defendants may therefore be subject to jurisdiction if Barneli—in bringing the 2008 lawsuit—was their agent, acting at their specific direction and for their personal benefit.

The individual defendants—Cugny, Tamone, Broll, and Croisier—are not subject to personal jurisdiction on this agency theory because none is alleged to have personally benefited from Barneli's actions in bringing the lawsuit in New York.  Although plaintiffs allege that Cugny, Tamone, and Croisier were officers or directors of Barneli (SAC ¶¶ 5, 11, 13), plaintiffs do not allege that any of these defendants was a shareholder or owner of the Panamanian corporation. (*See id.* ¶ 9; Broll Decl. ¶¶ 18, 19 (disclaiming any ownership or beneficial interest in Barneli or the New York lawsuit); Croisier Decl. ¶¶ 6, 14-15 (same); Cugny Decl. ¶¶ 7, 16-17 (same); Tamone Decl. ¶¶ 6, 19-20 (same).)

Instead, plaintiffs allege—with no factual basis set forth—that Croisier, Cugny, and Tamone "used their power over Barneli to further their personal interests and those of Broll." (SAC ¶ 141.)  This conclusory allegation fails to plausibly establish that Barneli was acting for Broll, Croisier, Cugny, or Tamone's individual benefit when Barneli filed the lawsuit in New York. These defendants are therefore not subject to jurisdiction on an agency theory.  *Compare Sterling Interiors Grp., Inc. v. Haworth, Inc.*, No. 94 CIV. 9216, 1996 WL 426379, at *15 (S.D.N.Y. July 30, 1996) (no long-arm jurisdiction under *Kreutter* where defendants were not alleged to be shareholders of the corporation and therefore "the corporation cannot be viewed as having acted on their behalf, for their benefit"), *with Moneygram Payment Sys., Inc. v. Consorcio Oriental, S.A.*, No.

05 Civ. 10773, 2007 WL 1489806, at *5 (S.D.N.Y. May 21, 2007) (long arm jurisdiction under *Kreutter*, where the defendant, as "a major shareholder . . . , benefitted from Consorcio's New York transactions").

The agency theory also does not support jurisdiction over Rashi or Gestrust.  Plaintiffs' bald allegations that Rashi was a hidden principal of Barneli find no factual support in the complaint. (*See, e.g.*, SAC ¶¶ 22, 36, 139.)  Plaintiffs do not allege that Rashi in any way directed or controlled Barneli when it sued plaintiffs in New York or that it had any ownership interest in Barneli. (*See generally* SAC; Turgeman Decl. ¶¶ 9, 11-12 (averring that Rashi never controlled Barneli, had no ownership interest in the entity, and was not involved in the commencement of the 2008 lawsuit).)  Accordingly, Barneli's actions cannot fairly be imputed to Rashi. *See, e.g., Briley v. Blackford*, No. 89 CIV. 8365, 1990 WL 124341, at *7-8 (S.D.N.Y. Aug. 21, 1990).

Similarly, the Court declines to exercise personal jurisdiction over Gestrust as a "hidden principal" of Barneli. (SAC ¶ 139.)  Plaintiffs do not allege that Gestrust was the primary actor or controlled Barneli's decision to bring the 2008 lawsuit in New York.  Rather, plaintiffs' allegations underscore that the lawsuit was filed "at the specific behest of Leven," the disclosed principal of Barneli. (SAC ¶¶ 15, 106; *see also id.* ¶¶ 72, 85.)  Moreover, although plaintiffs allege, in one paragraph, that Gestrust was the sole shareholder of Barneli (*id.* ¶ 16),[11] plaintiffs also allege—and the materials accompanying Gestrust's motion support—that Gestrust actually served as trustee to the Redid Trust, which owned shares of Barneli (*see* SAC ¶ 16; Exhibit VIII to the Subscription Agreement, Ex. C to Angst Decl. (noting that Gestrust was a trustee of Barneli); Angst Decl. ¶¶ 3-4).  Serving as a trustee for an entity that owned shares of Barneli—with no factual allegations as to Gestrust's specific role in initiating and

---

[11] Plaintiffs, in opposition to Gestrust's motion, actually reject this position, asserting that Gestrust was *not* a shareholder of Barneli. (Pls.' Opp'n Gestrust at 12.)

prosecuting Barneli's lawsuit—is plainly insufficient to confer jurisdiction here.  *See, e.g., Phillips v. Reed Grp., Ltd.*, 955 F. Supp. 2d 201, 231 (S.D.N.Y. 2013) ("Certainly, Nagel's mere status as an alleged 'trustee' of an entity that owns a stake in the [defendant who acted in New York] is insufficient to suggest that [that defendant] or others acted in New York at Nagel's direction and control.")[12]

> ii.    Alter Ego Theory

Plaintiffs also allege that various defendants, including Croisier, Cugny, Tamone, Broll, and Gestrust, are alter egos of Barneli (SAC ¶¶ 38, 138) and therefore may be subject to jurisdiction for Barneli's actions in New York.  Under an alter ego theory, plaintiffs allege that Barneli was a shell corporation under the complete domination and control of defendants and is not entitled to a legal identity separate from them.

To determine which law to apply to plaintiffs' alter ego allegations, this Court must employ a choice-of-law analysis.  "When a federal district court sits in diversity, it generally applies the law of the state in which it[] sits, including that state's choice of law rules." *In re Coudert Bros. LLP*, 673 F.3d 180, 186 (2d Cir. 2012) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).  It is well-settled that New York's choice-of-law rules dictate that "the law of the state of incorporation determines when the corporate form will be disregarded." *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks omitted); *Sweeney, Cohn, Stahl & Vaccaro v. Kane*, 6 A.D.3d 72, 75, 773 N.Y.S.2d 420, 423 (2d Dept. 2004). "Because a corporation is a creature of state law whose primary purpose is to insulate shareholders from legal liability, the state of incorporation has the greater interest in determining when and if that insulation is to be stripped away." *Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993) (internal quotation marks omitted) (applying the law of the state

---

[12] Gestrust was also removed as trustee for Redid before Barneli sued plaintiffs in April 2008. (Angst Decl. ¶¶ 3-4; *see also* Ex. A to Angst Decl.)

of incorporation even where the applicable contract contained a differing choice-of-law provision).

Since Barneli was incorporated in the Republic of Panama (SAC ¶ 15), this Court will apply Panama's veil-piercing doctrine to plaintiffs' alter ego allegations.  *See, e.g., Panam Mgmt. Grp., Inc. v. Pena*, No. 08-CV-2258, 2011 WL 3423338, at *3 (E.D.N.Y. Aug. 4, 2011).

In determining foreign law, a court may "consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."  Fed. R. Civ. P. 44.1.  However, "the party claiming foreign law applies carries both the burden of raising the issue that foreign law may apply in an action and the burden of proving foreign law to enable the district court to apply it in a particular case."  *Bigio v. Coca-Cola Co.*, No. 97 CIV. 2858, 2010 WL 3377503, at *4 (S.D.N.Y. Aug. 23, 2010) (internal quotation marks omitted), *aff'd*, 675 F.3d 163 (2d Cir. 2012).  Written and oral testimony from experts, who are "not required to meet any special qualifications," remains the "basic mode of proving foreign law."  *Id.*  The expert testimony should help the court understand the content of the governing law, but courts need not credit the experts' application of law to the facts of the case.  *Id.*  The court may also "rely on the decisions of other courts" in determining foreign law.  *Panam Mgmt. Grp.*, 2011 WL 3423338, at *4.

Cugny, Tamone, and Croisier submitted the expert testimony of Jorge Molina Mendoza, an attorney in the Republic of Panama, in support of their motion to dismiss the complaint.  Gestrust and Broll also rely on Mendoza's testimony in their respective motions.  Plaintiffs did not submit any evidence—in the form of an expert declaration or otherwise—regarding Panama's veil-piercing doctrine.

According to Mendoza, the Code of Commerce of the Republic of Panama recognizes the creation of the corporate veil: that is, a "business corporation organized according to the provisions of [the Code of Commerce] shall have its own juridical status and different from that of

the shareholders for all its acts and contracts." (Decl. Setting Forth Panamanian Legal Opinion of Jorge Molina Mendoza ("Mendoza Decl.") at 3 (quoting Article 251 of the Code of Commerce of the Republic of Panama).)  Likewise, pursuant to Article 444 of the Code of Commerce, "[d]irectors shall not assume any personal liability for the corporation's obligations" except in certain limited circumstances not relevant here.  (*Id.* at 7-8); *see also Panam Mgmt. Grp.,* 2011 WL 3423338, at *4 (noting that, pursuant to Panamanian law, "shareholders, directors and officers are not liable to pay with their personal assets for their rights and obligations acquired by the corporation, regardless of whether they acted on behalf of the corporation" (internal quotation marks omitted)).

Legislation in Panama "does not provide for mechanisms to tear the corporate veil," but the Supreme Court of Justice of Panama has recognized that it may occur in "exceptional circumstances" and on a "provisional basis," where "corporations have been used with the sole intention of defrauding third parties or violating the law, thus resulting in a case of abuse of the legal capacity." (Mendoza Decl. at 2, 5-6); *see also Panam Mgmt. Grp.,* 2011 WL 3423338, at *5.  "The criterion used by [Panamanian courts] to tear the corporate veil always has as common denominator the fact that the shareholders have not respected the legal entity, as well as the breach of the principle of separation of personalities, to reach those hidden behind it." (Mendoza Decl. at 5-6.)

Plaintiffs' allegations fail to hurdle the high bar set by Panamanian precedent.  There are no allegations that Broll—who was not a shareholder, director, or officer of Barneli—somehow disregarded Barneli's legal status.  Putting aside plaintiffs' contradictory allegation that Gestrust was a shareholder of Barneli, plaintiffs themselves recognize in their brief that "Gestrust [wa]s not an employee, shareholder, officer or owner of Barneli" and therefore renounce any alter ego allegations. (Pls.' Opp'n Gestrust at 12.)  Although it is unclear based on plaintiffs' muddled allegations whether Rashi is alleged to be an alter ego of Barneli, the same

result holds for Rashi, as it was not a shareholder, officer, or director of Barneli.

Turning to Cugny, Tamone, and Croisier, the Court finds that plaintiffs have failed to allege a factual basis for piercing the corporate veil to reach these directors of Barneli.  First, there are no specific allegations that these individual defendants failed to respect Barneli's legal personality aside from the naked, conclusory, and formulaic allegations that they undercapitalized Barneli, ignored corporate formalities, and dominated its affairs. (SAC ¶¶ 141-44, 146.)  In fact, plaintiffs assert all but one of these allegations against "the individual defendants" or "defendants" generally, without specifying the role of Cugny, Tamone, or Croisier in abusing the corporate form to perpetuate a fraud.[13]  *See Karabu Corp. v. Gitner*, 16 F. Supp. 2d 319, 324 (S.D.N.Y. 1998); *cf. De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996) (affirming the dismissal of claims against an alleged alter ego where the plaintiffs' allegations were conclusory and "devoid of *any* specific facts" that defendants acted to defraud plaintiffs); *Strojmaterialintorg v. Russian Am. Commercial Corp.*, 815 F. Supp. 103, 104-05 (E.D.N.Y. 1993).

Moreover, to the extent that defendants' expert avers that Panamanian courts will only pierce the corporate veil to reach shareholders—but not directors—who use the corporate form to commit illicit acts in Panama (*see* Mendoza Decl. at 6-8); *but see Panam Mgmt. Grp.*, 2011 WL 3423338, at *5, Cugny, Tamone, and Croisier cannot be responsible for—or subject to personal jurisdiction based on—the actions of Barneli.

---

[13] Plaintiffs' allegations that Cugny once used his personal email address to email Fortis, when he was presumably working on behalf of Barneli, or that he used the same fax number as Barneli are certainly insufficient to find that Cugny breached the principle of the separation of personalities. (*See* SAC ¶¶ 69, 75.)

In conclusion, N.Y. C.P.L.R. § 302(a)(1) fails to provide a basis for this Court to exercise personal jurisdiction over the moving defendants for the breach of contract claims in the complaint.

### 3. *N.Y. C.P.L.R. § 302(a)(3)(ii)—commission of a tortious act outside the state causing injury within the state*

Plaintiffs find no greater success invoking section 302(a)(3)(ii), which permits the exercise of jurisdiction over a foreign defendant who "commits a tortious act without the state causing injury to person or property within the state . . . , if he expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce."  Plaintiffs assert that they suffered the loss of fees for work performed in New York as well as future profits and business investors.

New York courts routinely hold that a breach of contract claim does not constitute a tortious act and may not form the basis of long-arm jurisdiction pursuant to section 302(a)(3).  *See, e.g., Amigo Foods Corp. v. Marine Midland Bank-New York*, 39 N.Y.2d 391, 396 (1976); *Pramer S.C.A. v. Abaplus Int'l Corp.*, 76 A.D.3d 89, 97, 907 N.Y.S.2d 154, 159 (1st Dept. 2010); *see also PI, Inc. v. Quality Prods., Inc.*, 907 F. Supp. 752, 760 (S.D.N.Y. 1995) ("To satisfy New York's long arm statute, the complaint must 'adequately frame a cause of action in tort arising from [the alleged tortious acts].'")

Plaintiffs' first two substantive causes of action are expressly denoted "Breach of Contract—Fees" and "Breach of Contract—Indemnification" in the complaint.  As explained above, the third cause of action for alter ego/hidden principal liability is not separately cognizable pursuant to New York law, but is rather a mechanism to hold defendants liable under the two breach of contract causes of action.

Nonetheless, plaintiffs contend that they have alleged a tort because they include the word "fraud" in a handful of allegations and allege that defendants intended to "perpetuate a fraud and effectuate the breach of

the agreements" by depriving plaintiffs of the money owed to them pursuant to the agreements. (SAC ¶ 39; *see also id.* ¶¶ 17, 145-46.)  But "[b]y merely alleging a tortious act, a plaintiff may not convert a simple breach of contract case into a tort for jurisdictional purposes." *Kulas v. Adachi*, No. 96 CIV. 6674, 1997 WL 256957, at *8 (S.D.N.Y. May 16, 1997); *see, e.g., Amigo Foods Corp.*, 39 N.Y.2d at 396.

Rather, plaintiffs must "aver facts that if credited, would suffice to establish all the requirements under one of § 302(a)'s subsections, including the commission of a tort," here, fraud.  *Bank Brussels Lambert*, 171 F.3d at 785.  Plaintiffs' allegations of fraud—including their allegations that defendants used a fraudulent shell corporation scheme to deprive Jonas of his fees (SAC ¶ 39) and proprietary strategies (*id.* ¶ 145)—are wholly conclusory[14] and fail to identify a legal duty separate from the contractual duty to pay his fees.  *See Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 389-90 (1987); *Skrodzki v. Marcello*, 810 F. Supp. 2d 501, 521 (E.D.N.Y. 2011); *Kulas,* 1997 WL 256957, at *9 ("[W]here a fraud claim arises out of the same facts as plaintiff's breach of contract claim, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties, the fraud claim is redundant and plaintiff's sole remedy is for breach of contract." (internal quotation marks omitted)).

Moreover, plaintiffs fail to allege facts sufficient to establish that each defendant derives substantial revenue from interstate or international commerce.  *See SunLight Gen. Capital,* 114 A.D.3d at 522 (no personal jurisdiction pursuant to section 302(a)(3)(ii) "in the absence of evidence that these defendants 'derive substantial revenue from interstate or

---

[14] The complaint is bereft of any factual allegation related to defendants' purported use of Jonas's trading strategies.  In fact, there is not a single allegation as to who stole, implemented, or profited from these strategies.

international commerce'"); *Mangia Media Inc. v. Univ. Pipeline, Inc.*, 846 F. Supp. 2d 319, 323 (E.D.N.Y. 2012).

### 4. N.Y. C.P.L.R. § 302(a)(4)—ownership of real property in New York

Section 302(a)(4) permits the court to exercise jurisdiction arising out of a defendant's ownership or possession of "real property situated within the state," but this subsection requires "a relationship between the property and the cause of action sued upon." *Lancaster v. Colonial Motor Freight Line, Inc.*, 177 A.D.2d 152, 159, 581 N.Y.S.2d 283 (1st Dept. 1992). Although the complaint alleges that Cugny and Tamone previously owned real property—a residential condominium—in New York through A.M.S.S. Realty Corp. (SAC ¶¶ 6, 11), there are no allegations linking that property to plaintiffs' causes of action. As plaintiffs' claims do not arise from the ownership of this property, this subsection does not establish a basis for the Court's jurisdiction over Cugny and Tamone. *See id.*; *Mangia Media Inc.*, 846 F. Supp. 2d at 323.

### 5. N.Y. C.P.L.R. § 303—designation of attorney as agent of service

Plaintiffs' attempt to invoke N.Y. C.P.L.R. § 303 as a basis for personal jurisdiction also falls short. Pursuant to that section, a person who commences a lawsuit in New York state—and is otherwise not subject to personal jurisdiction—designates his attorney as agent for service of process, during the pendency of that litigation, "in any separate action in which such person is a defendant and another party to the action is a plaintiff if such separate action would have been permitted as a counterclaim had the action been brought in the supreme court." Aside from the fact that this section does not itself confer personal jurisdiction, but merely designates an attorney as an agent of process, *and* plaintiffs did not serve the attorney in the 2008 Barneli suit on behalf of the moving defendants (*see* Dkt. Nos. 20, 21, 35-37), this statute only applies during the

pendency of the original litigation brought by Barneli.  N.Y. C.P.L.R. § 303; *Paola Vista Clothing, Ltd. v. V.R.P. Calzaturificio S.P.A.*, 148 A.D.2d 593, 595, 539 N.Y.S.2d 59 (2d Dept. 1989).  The Barneli suit ended in May 2012 (SAC ¶ 109); this suit commenced in June 2013 (Notice of Removal ¶ 3).  This section thus fails to subject defendants to personal jurisdiction here.

### 6. *Due Process*

Since this Court finds that it lacks personal jurisdiction over the moving defendants pursuant to New York's long-arm statute, it will not address the issue of whether the exercise of personal jurisdiction would offend due process. *See, e.g.*, *Bensusan Rest. Corp. v. King*, 126 F.3d 25, 27 (2d Cir. 1997); *Mangia Media Inc.*, 846 F. Supp. 2d at 323-24.

## IV. CONCLUSION

Because this Court lacks personal jurisdiction over the moving defendants, the Court grants their respective motions to dismiss the complaint with prejudice (Dkt. Nos. 43, 48, 52, 56).  The Clerk of Court is directed to dismiss this action with prejudice.

Dated:  New York, New York
      July 27, 2015

SO ORDERED:

Sidney H. Stein, U.S.D.J.